**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**SHANE MACK LOWRY,**

**Plaintiff,**

**v.**                                                    **Civil Action  No. 1:04cv60**
                                                         **(Judge Bailey)**

**B.A. BLEDSOE, ALICE LOWE,**
**CAPTAIN BETLER, CHAPLAIN**
**WEIDMAN, CHAPLAIN KOWALCYK,**
**GENERAL FOREMAN ARMSTRONG,**

**Defendants.**

## OPINION/REPORT AND RECOMMENDATION

The *pro se* plaintiff initiated this case on March 31, 2004, by filing a civil rights complaint against the above-named defendants.  On May 5, 2005, the undersigned conducted a preliminary review of the file and determined that the plaintiff was alleging that the defendants violated his First Amendment right to freely practice the Wicca religion for the following six reasons:

(1) the defendants refused to provide him with necessary Wiccan worship materials;[1]

(2) the prison's religious library does not contain Wiccan reading and video materials, even though it contains religious literature and videos of all other religions;

(3) the Wiccan community is permitted less time in religious prayer services than inmates practicing other religions;

(4) General Foreman Armstrong ordered that the Wiccan fire pit be dismantled without permission from the Warden because he was short of cinder blocks;

---

[1] Those materials include: (1) Book of Shadows (Holy Wiccan Book); (2) Divination tool (tarot cards); (3) items to honor the elements of nature; (4) feather (herb) air; (5) anointing oils; (6) bell; (7) candles -- black and red, etc.; (8) drum; (9) herbs, sage, cedar, lavender, etc.; (10) icon (picture statute of the sacred, goat skull with horns; (11) rattle; and (12) taberred.  Complaint at 4.

(5) his request to have a Wiccan High Priestess bless the desecrated grounds was denied; and

(6) there is no Wiccan representative to offer weekly and monthly services and Wiccan religious holiday services.

Moreover, pursuant to the exhaustion requirements of the Prison Litigation Reform Act (PLRA), the undersigned found that the plaintiff failed to exhaust ground two regarding the prison's lack of Wiccan reading material, ground three regarding the Wiccan community being permitted less time in religious prayer services, ground four regarding the dismantling of the fire pit, and ground five regarding the failure to obtain a Wiccan High Priestess to bless the desecrated ground. As to ground one regarding the failure to provide religions materials, and ground six regarding when services are held and the failure to provide a Wiccan representative to conduct such services, the undersigned determined that those claims appeared to be exhausted and that the defendants should be made to file an answer with respect to those claims. Accordingly, the undersigned issued a Report and Recommendation that day, making the aforementioned recommendations to the District Judge.

On January 4, 2006, the Honorable W. Craig Broadwater,[2] United States District Judge, adopted the undersigned's Report and Recommendation in its entirety and dismissed without prejudice grounds two, three, four and five. In addition, Judge Broadwater ordered the defendants to file an answer to the claims raised in grounds one and six.

On January 22, 2007, the plaintiff filed a Motion for Immediate Injunction in which he states that he is being held in the Special Housing Unit ("SHU") pending investigation and requests that he, and all other inmates being similarly held, be immediately released.

---

[2] The case has since been reassigned to the Honorable John Preston Bailey, United States District Judge.

On April 18, 2007, the defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. Consequently, the Court issued a <u>Roseboro</u> Notice on May 2, 2007, advising the *pro se* petitioner of his right to file a response to the defendants' dispositive motion.

The petitioner filed his response on May 16, 2007. Accordingly, this case is now before the undersigned for a Report and Recommendation on the pending motions.

## I. The Pleadings

## A. The Complaint[3]

With respect to ground one, the plaintiff asserts that he has been practicing the Wicca Religion for over twenty years. Complaint at 3. In order to appropriately practice his religion, the plaintiff asserts that he has requested that certain religious worship items be made available at the camp facility at which he is incarcerated.[4] <u>Id.</u> at 4. The plaintiff asserts that upon his request, he was informed by Chaplain Kowalcyk that these items have been approved for inmates at the secured facility. <u>Id.</u> The plaintiff, however, complains that these items are not available to inmates at the camp facility. <u>Id.</u>

With respect to ground six, the plaintiff asserts that he has requested that Wiccan inmates be provided with a Wiccan representative to conduct services.[5] In addition, the plaintiff asserts that

---

[3] Because grounds two through five have been dismissed, the undersigned will limit the discussion of the complaint to only the remaining grounds.

[4] The plaintiff is incarcerated at the Gilmer Federal Correctional Institution ("FCI-Gilmer") in Glenville, West Virginia. FCI-Gilmer consists of a secured medium security facility and a separate camp facility. The plaintiff is incarcerated at the camp facility.

[5] The plaintiff does not specifically allege this claim in this complaint. This claim, however, is apparent from a reading of the plaintiff's administrative remedies attached to the complaint. Because a *pro se* plaintiff's pleadings are to be construed liberally, <u>see</u> <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the Court has construed the complaint to include this issue.

he asked that the time for Wiccan services be moved.[6]  The plaintiff contends that his requests have been denied and that the denial of such requests violates his right to freely practice his religion.  The plaintiff also contends that the Wiccan religion is treated differently than other, more conventional, religions.

## B.  **The Defendants' Motion**

In their motion, the defendants' assert that the plaintiff has failed to properly exhaust his administrative remedies, has failed to state a claim upon which relief can be granted, and, assuming *arguendo*, that a constitutional claim has been stated, that the defendants are entitled to qualified immunity.

## C.  **The Plaintiff's Reply**

In his reply, the plaintiff asserts that he is objecting to the defendants' motion on the grounds that the defendants' have had over three years and six time extensions in which to respond to the claims in the complaint.  The plaintiff asserts that he has provided the Court with "plenty of evidence" of the favoritism and unjust treatment he has received and how his requests have been ignored while similar requests by other religions have been granted.  Thus, the plaintiff asserts that he is entitled to plead his case in a court of law and that the defendants' motion should be denied.

## II.  **Standard of Review**

## A.  **Motion to Dismiss**

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations.  <u>Advanced Health-Care Services, Inc., v. Radford Community Hosp.</u>, 910 F.2d 139, 143 (4th Cir. 1990).  Moreover, dismissal for failure to state a claim is properly

---

[6] <u>See</u> note 5, <u>infra</u>.

granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## B.  <u>Motion for Summary Judgment</u>

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. Rule 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The

nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id.</u> This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, at 587 (citation omitted).

## III. Analysis

### A. Defendants Armstrong, Betler, Lowe and Bledsoe

Liability in a <u>Bivens</u> case is "personal, based upon each defendant's own constitutional violations." <u>Trulock v. Freeh</u>, 275 F.3d 391, 402 (4th Cir.2001)(internal citation omitted). Thus, in order to establish personal liability under <u>Bivens</u>, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. <u>See</u> <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a <u>Bivens</u> case. <u>Rizzo v. Good</u>, 423 U.S. 362 (1976). Instead, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988).

Nonetheless, in <u>Miltier v. Beorn</u>, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a <u>Bivens</u> action if the plaintiff shows that:

"(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations."   In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury."  <u>Id.</u>  A plaintiff cannot, however, establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. <u>Id.</u>  Rather, the plaintiff must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice.  <u>Id.</u>

 In grounds one and six, the plaintiff does not allege any personal involvement on the part of defendants Armstrong, Betler, Lowe, or Bledsoe.

As to defendant Armstrong, the plaintiff asserts that Armstrong was responsible for the dismantling of the fire pit.  That claim, however, was dismissed on preliminary review for the failure to exhaust.

As to defendant Betler, the Court can find no mention of this defendant anywhere in the complaint, other than the caption.[7]

---

[7] For this reason, the plaintiff's claims against defendant Betler are also dismissible under Rule 8 of the Federal Rules of Civil Procedure.  Pursuant to Rule 8(a), "[a] pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim *showing that the pleader is entitled to relief*, and (3) a demand for judgment for the relief the pleader seeks." (Emphasis added).   "And, although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by  plaintiff that he has a valid claim of some type against defendant." <u>Migdal v. Rowe Price-Fleming International, Inc.</u>, 248 F.3d 321, 326 (4th Cir. 2001) (citation and internal quotations omitted).
       As noted above, the plaintiff names Captain Betler as a defendant in this action simply by listing

As to defendants Bledsoe and Lowe, it appears that the plaintiff's claims against those defendants arise merely due to their positions as the former Warden and Camp Administrator, respectively.[8]  However, the plaintiff has not provided any evidence that these defendants tacitly authorized or were indifferent to an alleged violation of his constitutional rights.

Furthermore, to the extent that the plaintiff may be asserting that defendants Bledsoe or Lowe violated his constitutional rights by denying his institutional grievances, that claim is also without merit as this is not the type of personal involvement required to state a Bivens claim.  See Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003).

Accordingly, the plaintiff cannot maintain his claims against defendants Armstrong, Betler, Bledsoe, or Lowe, and those defendants are entitled to judgment as a matter of law.

**B.  Defendants Weidman and Kowalczyk**

**1.  Exhaustion**

Upon a preliminary review of grounds one and six, the undersigned found that grounds one and six appeared  to be exhausted because the petitioner filed those claims at all three levels of the

---

the Captain's name in the caption of the case.  The plaintiff provides no explanation in the body of the complaint, or elsewhere, to show how this defendant participated or was otherwise involved in any violation of the plaintiff's constitutional rights.  Such a bald statement that the plaintiff is entitled to relief from this defendant without any factual support is insufficient under Rule 8.  Accordingly, the plaintiff has insufficiently pled his claim against defendant Betler and that defendant should be dismissed.  See Weller v. Dept. of Social Servs., 901 F.2d 387 (4th Cir. 1990) (dismissal proper where there were no allegations against defendants).

[8] A suit against a government agent acting in his official capacity is considered a suit against the United States itself.  Kentucky v. Graham, 473 U.S. 159, 165 (1985).  Where damages are sought against federal defendants in their official capacities, the case is deemed as being against the United States.  Dugan v. Rank, 372 U.S. 609 (1963).  However, "[t]he United States, as a sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941) (citations omitted).  The United States has not waived its sovereign immunity from liability for an award of damages arising from alleged violations of the Constitution.  FDIC v. Meyer, 510 U.S. 471, 485-86 (1994).  Accordingly, plaintiffs' Bivens  claims against the defendants in their official capacities are barred by the doctrine of sovereign immunity.

Bureau of Prisons' ("BOP") formal administrative remedy program. Dckt. 12 at 5. It was noted, however, that the final disposition of the plaintiff's claims at the Central Office level was unclear. Id. Therefore, the undersigned recommended that the defendants be made to answer these claims. Id.

In their motion to dismiss, the defendants' now assert that, in fact, grounds one and six were not exhausted because although the petitioner filed those claims at all levels of the program, his Central Office remedy was rejected. Because the plaintiff failed to rectify the procedural deficiencies in his Central Office remedy, the defendants assert that the plaintiff failed to properly complete all levels of the process. Therefore, the respondent urges the court to reconsider its prior decision regarding exhaustion of these claims and find that grounds one and six should be dismissed for the failure to exhaust.

Under the PLRA, a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42 U.S.C. § 1983, is subject to the exhaust of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[9] and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added). Moreover, an inmate may procedurally default his claims

---

[9] Id.

by failing to follow the proper procedures. See Woodford v. Ngo, ___ U.S. ___, 126 S.Ct. 2378 (2006) (recognizing the PLRA provisions contain a procedural default component).

The BOP makes available to its inmates a three level administrative remedy process if informal resolution procedures fail to achieve sufficient results. See 28 C.F.R. § 542.10, et seq. This process is begun by filing a Request for Administrative Remedy at the institution where the inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal that decision to the Regional Office for the geographic region in which the inmate's institution of confinement is located. (For inmates confined at FCI-Gilmer, those appeals are sent to the Mid-Atlantic Regional Director in Annapolis Junction, Maryland.) If the Regional Office denies relief, the inmate can appeal to the Office of General Counsel via a Central Office Administrative Remedy Appeal. An inmate must fully complete each level of the process in order to properly exhaust his administrative remedies.

Here, on October 20, 2003, the plaintiff filed administrative remedy request number 314011. Memorandum (dckt. 55), Ex. 1 (hereinafter "Ex. 1") at Att. A. In that request, the plaintiff complained to the Warden that the Chaplains at FCI-Gilmer were discriminating against Wiccans by not providing religious materials or a Wiccan representative to conduct services. Id. The plaintiff's request for administrative remedy was denied on October 29, 2003 because the Warden found that the requested materials had already been provided and that religious services was trying to locate a Wiccan volunteer. Id.

On November 12, 2003, the plaintiff appealed the Warden's decision to the Regional Office. Id. at Att. B. On December 17, 2003, the Regional Office denied the plaintiff's appeal because it found that FCI-Gilmer was in compliance with the BOP's program statement on Religious Beliefs

and Practices.  Id.  More specifically, the Regional Office found that the scheduling of religious services was fair and equitable among the different religious groups, that FCI-Gilmer had secured a Wiccan volunteer, but that the volunteer herself cancelled the scheduled visit, and that certain religious literature had been approved for purchase when funds became available.  Id.  Therefore, the Regional Office found that the plaintiff's religious rights had not been violated.  Id.

On December 30, 2003, the plaintiff attempted to appeal the decision of the Regional Office to the Central Office.  Id. at Att. C.  However, that appeal was rejected and returned because the plaintiff failed to comply with the procedural requirements of attaching a copying of the underlying institutional remedy.  Memorandum at 23.  The record shows that plaintiff was given 15 days to resubmit the appeal in proper form.  Id.  Nonetheless, there is no evidence that the plaintiff resubmitted his appeal to the Central Office in the allotted fifteen days.  Ex. 1 at ¶¶ 18-19.

On February 24, 2004, the plaintiff wrote a letter to the Central Office inquiring about the status of his appeal.  (Dckt. 10)  In his letter, the plaintiff asserted that he did not receive notification that his appeal had been received or any final disposition on the matter.  Id.  The plaintiff requested to know if the time period for answering his appeal had been extended.  Id.

On March 25, 2004, the plaintiff received a response from the Central Office in which he was advised that his administrative appeal had been received, rejected and returned to him on January 2, 2004.  Id.  The plaintiff thereafter resubmitted his appeal to the Central Office with a note stating that he did not receive the prior response.  Id.  The second appeal was dated March 22, 2004, but was not received by the Central Office until April 5, 2004, six days after the plaintiff initiated this case.  Ex. 1 at Att. C.

The plaintiff's second appeal was rejected as untimely on April 7, 2004.  Id.  However, the

Central Office advised the plaintiff that it would reconsider his second appeal if he could provide staff verification that the untimeliness of his second appeal was not his fault. (Dckt. 10) The plaintiff failed to resubmit his appeal with the appropriate verification. Ex. 1 at ¶ 21.

For these reasons, the defendants submit that the plaintiff has failed as a matter of law to exhaust his administrative remedies. Memorandum (dckt. 55) at 24. Citing <u>Woodford v. Ngo</u>, 126 S.Ct. at 1386, the defendants assert that in order to properly exhaust administrative remedies, an inmate must follow the rules and strictly comply with the requirements of the administrative process. <u>Id.</u> Therefore, every level of administrative review must be satisfied. <u>Id.</u> The failure to do so mandates dismissal for lack of exhaustion. <u>Id.</u>

After reviewing the additional materials and explanation provided by the defendants, the undersigned is of the opinion that grounds one and six of the complaint are not exhausted. As shown by the defendants, and undisputed by the plaintiff, he did not properly complete all levels of the BOP's administrative remedy process. Such failure to comply with the appropriate procedural rules mandates the dismissal of his claims for the failure to exhaust. <u>See</u> <u>Woodford v. Ngo</u>, <u>supra</u>.

Nevertheless, assuming that grounds one and six were properly exhausted, the defendants are entitled to judgment as a matter of law for the following reasons.

### 2. Free Exercise Claim

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. With regard to prisoners, the Supreme Court has specifically found that a prison inmate retains only those First Amendment rights "that are not

inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Therefore, a prison policy "alleged to infringe constitutional rights [is] judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone v. Estate Shabazz, 482 U.S. 342, 349 (1987). Furthermore, the Court is required to give deference to the judgment of prison administrators in First Amendment challenges. Id. at 350.

In Turner v. Safley, 482 U.S. 78, 85 (1987), the United States Supreme Court formulated a reasonableness test sensitive to both the need to protect the constitutional rights of inmates and the policy of judicial restraint regarding prisoner complaints. Specifically, the Court determined that when a prison regulation or policy "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. Therefore, although a prison regulation may infringe on an inmate's constitutional rights, that infringement is only actionable to the extent that the regulation is unreasonable. See Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000), cert. denied, 532 U.S. 932, 121 S.Ct. 1382 (2001).

In articulating the Turner test, the Court identified several "factors that are relevant to, and that serve to channel, the reasonableness inquiry." Thornburgh v. Abbott, 490 U.S. 401, 414 (1989). The Turner factors are: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and, (4) whether the regulation represents an "exaggerated response" to prison concerns. Turner at 89-91; Shaw v. Murphy, 534 U.S. 223,

229-30 (2001).

However, prior to considering the <u>Turner</u> requirements, the Court must determine whether there has been an infringement in the first place. <u>See</u> <u>Ali v. Dixon</u>, 912 F.2d 86, 89 (4th Cir. 1990). Thus, the first step is to determine whether the plaintiff is sincere in his asserted religious beliefs, and if he is, that his claims are rooted in belief and are not "purely secular." <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 215-216 (1972); <u>see</u> <u>also</u> <u>Turner</u>, 482 U.S. at 89-91; <u>O'Lone</u>, 482 U.S. at 345.

Here, this it is not disputed that the plaintiff's religious beliefs are sincerely held. Thus, the Court will turn to whether or not the defendants have unreasonably restricted the plaintiff's right to freely practice his religion.

### (a) Religious Materials

The undisputed facts[10] show that FCI-Gilmer was opened on April 21, 2003, and houses

---

[10] Under Rule 56(e) of the Federal Rules of Civil Procedure, if a plaintiff wants certain evidence to be considered in opposition to a defendant's summary judgment motion, the plaintiff is required to point it out to the district court. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). In other words, the party opposing a motion for summary judgment motion may not depend upon the mere allegations in his pleadings to counter it. Pursuant to Rule 56, the party opposing the motion must respond with counter sworn affidavits and/or documents to set forth specific facts showing that there is a genuine issue of material fact in dispute. If the opposing party fails to respond to the motion or responds, but the response does not comply with the requirements of Rule 56 as stated above, the Court may declare that the facts in the affidavits and/or documents supporting the motion are established as true and that there is no genuine issue of material fact in dispute. <u>See also</u> <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir.2001) (district court need not examine entire file for evidence establishing a genuine issue of fact, where evidence is not set forth in opposition papers to motion for summary judgment with adequate references so evidence can be conveniently found); <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 672 (10th Cir.1998) (same); <u>Forsyth v. Barr</u>, 19 F.3d 1527, 1537 (5th Cir.1994) (same); <u>L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.</u>, 9 F.3d 561, 567 (7th Cir.1993) (same); <u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 404-06 (6th Cir.1992) (same). Here, the plaintiff's response to the defendants' summary judgment motion relies solely upon unspecified evidence presented prior to the filing of the defendants' motion. The plaintiff has not filed any sworn affidavits and/or other documents to counter the sworn declarations provided by the defendants in support of their motion. Accordingly, the undersigned has accepted the facts as stated by the defendants as true and no genuine issue of material fact remains.

approximately 1570 medium security male inmates. Memorandum at 3. The adjacent satellite camp

was opened on March 24, 2003, and houses approximately 130 minimum security male inmates.

Id. at 3-4. The plaintiff has been at the satellite camp at FCI-Gilmer since its activation. Id. at 4.

As part of the activation process at FCI-Gilmer, the BOP's Regional Chaplain purchased religious

supplies, as well as books, reference material, and video for more than 30 religious groups, including

the Wiccans. Id., Ex. 2 (hereinafter "Ex. 2") at ¶ 8. The items purchased for the Wiccan group

included the ritual tools most commonly used for performing religious worship and rituals.[11] Id.

Since the activation of FCI-Gilmer, all recognized religious groups have continued to be provided

with the supplies necessary to practice their faiths, as time and budgetary constraints allow. Ex. 2

at ¶¶ 8-12; Ex. 3 at ¶¶ 8-12. The defendants assert Religious Services has regularly replaced and

purchased religious items for the Wicca faith at both the secured institution and the camp facility.

Id.

 In addition, the BOP allows all faiths to possess certain personal items in their cells for the

purpose of performing religious rituals or worshiping on their own. Memorandum at 6. For Wiccan

inmates, those personal items include: (1) a Book of Shadows; (2) Divination Tool (tarot cards); (3)

Items to honor the Elements of Nature, Salt for the Earth, a Feather or Herb for the Air, a Wood

Wand for Fire, and Water for Water; and (4) a religious medallion, usually a Pentacle and a chain.

Ex. 2 at ¶ 13 and Att. B; Ex. 3 at ¶ 13 and Att. B.

---

[11] The defendants explain that "[t]he Wiccan faith is earth, nature and fertility oriented, and its adherents worship at the turn of the seasons and at the various lunar phases, equinoxes, and solstices." Memorandum at 5. However, Wiccans practice or worship in their own groups known as covens. Id. Unlike most other religions, Wiccans have no central dogma or doctrine from which to worship. Id. Instead, the faith "encompasses a number of basic traditions, while allowing and indeed expecting individual members, and covens, to develop and refine their own practices, worship, celebrations, and the performance of ritual ceremonies." Id. Because their religion allows such flexibility, there are many forms of Wicca and a wide range of acceptable beliefs and practices within the faith. Id.

In addition to these items, Wiccans may also possess other personal items, but for security reasons, those items are not allowed in an inmate's cell of living quarters. Memorandum at 6. Such other items include: (1) Altar; (2) Altar Cloth; (3) Anointing Oil; (4) bell; (5) candles; (6) Chalice; (7) drum; (8) herbs (sage, cedar, lavender); (9) Icon (picture or statue of the Sacred); (10) incense; (11) Pentacle; (12) Pentagram; (13) quartz crystal; (14) rattle; and (15) tabbared. Id. at 7. However, while these items are permitted, not every item has been deemed essential or required for the practice of the Wiccan faith. Ex. 2 ¶ 14; Ex. 3 at ¶ 14.

The defendants concede that the plaintiff has requested and sent complaints to staff on numerous occasions regarding religious materials. Memorandum at 7. However, neither Chaplain Weidman nor Chaplain Kowalczyk is aware of any occasion where Wiccan ceremonies could not be performed for lack of the required materials. Id. Moreover, both defendants aver that they have met with the plaintiff and discussed his concerns and neither can recall ever refusing to provide the plaintiff with necessary worship materials. Ex. 2 at ¶¶ 6, 7, 12, 15 and 16; Ex. 3 at ¶¶ 6, 7, 12, 15 and 16. In fact, despite budgetary restraints, the defendants assert that many of the items requested by the plaintiff have already been provided to the Wiccan group. Ex. 2 at ¶ 36.

Upon a review of the evidence submitted in this case, the undersigned finds that the petitioner's claim that he was denied religious materials in violation of his First Amendment right to freely practice his religion is refuted by the record. The defendants, and indeed, even the plaintiff, have provided copies of administrative responses which show that the items requested by the plaintiff had either already been purchased for the group or orders were submitted upon request. Moreover, additional items, such as anointing oil, were available for purchase in the commissary. Some items that the plaintiff requested, such as a blind for privacy, were denied for security reasons.

A legitimate penological interest. Moreover, even had the items not been provided to the plaintiff upon request, he has failed to show how the failure to provide these items substantially burdened or prohibited the practice of his religion. See Kay v. Friel, 2007 WL 295556 *2 (D.Utah Jan. 26, 2007) (finding plaintiff could not state a free exercise claim in the absence of any facts showing that the worship materials allegedly withheld were necessary to the practice of the Wicca religion).

Accordingly, the plaintiff has failed to show that the defendants have failed to provide him religious materials in violation of his First Amendment right to freely practice his religion and this ground should be dismissed with prejudice.

### (b) Failure to Change Hours of Worship

With respect to the plaintiff's request that the hours of worship be changed, the defendants assert that the plaintiff was requesting permission to allow worship in the evening and late hours of the night, usually after dark. For obvious reasons of safety and security, those requests were denied. Accordingly, the plaintiff has failed to show that the plaintiff's failure to change the hours of Wiccan worship violated his First Amendment right to freely practice his religion and this ground should be dismissed with prejudice.

### (c) Failure to Provide Representative

With respect to the plaintiff's claim that the BOP has failed to provide a Wiccan representative to conduct services and/or rituals, the defendants assert that they have made every effort to find a Wiccan representative to conduct services.[12] However, in order for a religious contractor or volunteer to come into a BOP institution to attend the spiritual needs of inmates, he

---

[12] The defendants assert that they have contacted Wiccan groups in West Virginia, Ohio, Pennsylvania and Kentucky. Memorandum at 15. Chaplain Weidman has also conducted internet searches, sent e-mails and made a number of phone calls to Wiccan groups in the surrounding areas in an effort to obtain volunteers to serve as a guide to the Wiccan inmates at FCI-Gilmer. Ex. 2 at ¶¶ 36-38.

or she is required to submit to and pass a background check, and must also undergo training sessions on such topics as security and safety. Memorandum at 15. Of the persons contacted by the defendants, many would not submit to the mandatory background check, or it they did, could not pass it. Ex. 2 at ¶¶ 36-38; Ex. 3 at ¶ 20.

Moreover, Chaplain Weidman submits that she did in fact find a volunteer from the Beckley, West Virginia area who agreed to come to the facility. Memorandum at 15. However, on the day before her scheduled visit, the volunteer telephoned and cancelled. Id. Chaplain Weidman continued to contact this person to reschedule, but her e-mails and telephone calls went unanswered. Id. at 16. From what Chaplain Weidman could determine, there are simply no practioners in this geographic area who are available. Ex. 2 at ¶ 41.

Clearly, the defendants have made every reasonable effort to find a Wiccan representative who is willing to come to the institution to perform services and counsel the Wiccan inmates. The fact that there is no volunteer available in this area is unfortunate. However, such problem is beyond the control of the defendants. Moreover, the plaintiff has not shown how the lack of a Wiccan volunteer substantially burdens or prohibits him from freely practicing his religion. The plaintiff is still free to practice his religion individually, or presumably, with the other Wiccan inmates, if any, at the FCI-Gilmer camp.

Accordingly, the plaintiff has failed to show how the failure to provide a Wiccan representative violates his First Amendment right to freely practice his religion and this ground should be dismissed with prejudice.

### 3.  Establishment Clause Claims

Pursuant to the Establishment Clause, prison officials are prohibited from favoring any particular religion.  Cruz v. Beto, 405 U.S. 319, 321-22 (1972).  Under the reasonableness standard of Turner, prisons must afford inmates of minority religions "a reasonable opportunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts."  Id. at 322.  This does not mean, however, that "every religious sect or group within a prison - however few in number - must have identical facilities or personnel."  Id. at n. 2.  Disparate treatment between religious groups is only deemed unreasonable if it is the result of intentional discrimination.  See Harris v. McRae, 448 U.S. 297, 323, n. 26 (1980).

To the extent that the plaintiff claims that the defendants are biased against inmates of the Wiccan faith, or that they are denying Wiccan inmates a reasonable opportunity to pursue their faith compared to inmates of other faiths, the plaintiff has failed to show that any disparity in treatment is the result of intentionally or purposeful discrimination.  Rather, the defendants have gone out of their way to provide the plaintiff with his religious requests.  Any denial of his requests has been for reasons of safety and security, perfectly reasonable and legitimate concerns.  Moreover, the defendants cannot be faulted for the relatively small number of Wiccan practioners in the area surrounding FCI-Gilmer or the lack of available volunteers to assist with services.  See Cruz v. Beto, 405 U.S. at 322, n. 2 ("A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of demand.").  These are practical constraints beyond the control of the defendants.  Accordingly, the plaintiff has failed to allege sufficient facts to show an equal protection violation.

**IV.  Plaintiff's Motion for Immediate Injunction**

In this motion, the plaintiff asserts that on October 5, 2006, he was placed in the SHU pending an investigation.  However, the plaintiff asserts that he was really put in the SHU for filing paperwork against staff for illegal and unprofessional conduct.  At the time this motion was filed, the plaintiff alleges that he had been in the SHU for over 90 days.  The plaintiff concedes that he has not exhausted his administrative remedies with regard to this issue, but "begs" the Court to forego such process due to the very serious nature of this matter.  The plaintiff asserts that he is being held against policy, and therefore, illegally, and requests that this Court issue an Order directing the institution to release him, and *all* other inmates who are being similarly held, from the SHU.

The standard for granting injunctive relief in this Court is the balancing-of-hardship analysis set forth in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977).  In making this analysis, the Court must consider the following four factors:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
>
> (2) the likelihood of harm to the defendant if the requested relief is granted,
>
> (3) the likelihood that the plaintiff will succeed on the merits, and
>
> (4) the public interest.

Direx Israel, Ltd v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).  The "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction."  Id. (citation omitted).

A court will not grant a preliminary injunction unless the plaintiff first makes a "clear showing" that he will suffer irreparable injury without it.  Id.  The required harm "must be neither remote nor speculative, but actual and imminent."  Id. (citations and internal quotation omitted).

If such harm is demonstrated, the court must balance the likelihood of harm to the plaintiff if an injunction is not granted and the likelihood of harm to the defendant if it is granted. Id. (citation omitted). If the balance of those two factors "'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991) (citations omitted). However, "[a]s the balance tips away from the plaintiff, a stronger showing on the merits is required." Id. (citation omitted).

In his case, the plaintiff has failed to establish that he will suffer irreparable harm if an injunction does not issue. Moreover, the plaintiff has not, and cannot, establish a likelihood that he will succeed on the merits of this claim, since he concedes that this issue has not been presented to the BOP's administrative remedy program. Accordingly, the undersigned recommends that the plaintiff's motion for injunctive relief (dckt. 35) be DENIED.

## V. Recommendation

For the reasons set forth in this Order, the undersigned recommends that the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (dckt. 53) be GRANTED and the plaintiff's complaint be DENIED and DISMISSED with prejudice. It is further recommended that the plaintiff's Motion for Immediate Injunction (dckt. 35) be DENIED.

Within ten (10) days after being served with a copy of this Opinion/Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable John Preston Bailey, United States

District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Opinion/Report and Recommendation to the *pro se* plaintiff.

DATED: July 16, 2007.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE